UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
                                     :      NOT FOR PUBLICATION
                                     :
In re:                               :
                                     :      Case No.: 08-10239 (MG)
         PRC, LLC,                   :      Chapter 11
                                     :      Jointly Administered
                        Debtor.      :
------------------------------------------------------x
                                     :
PRC, LLC,                            :
                        Plaintiff,   :      Adv. Pro. No.: 08-01395 (MG)
                                     :
         v.                          :
                                     :
BANK OF AMERICA, N.A.,               :
                        Defendant.   :
------------------------------------------------------x
```

### AMENDED MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

JENNER & BLOCK LLP
*Attorneys for the Plaintiff*
919 Third Avenue
37th Floor
New York, NY 10022
By:     Marc B. Hankin, Esq.
        Of Counsel

LEVI LUBARSKY & FEIGENBAUM, LLP
*Attorneys for the Defendant*
1185 Avenue of the Americas
17th Floor
New York, NY 10036
By:     Walter E. Swearingen
        Of Counsel

**MARTIN GLENN**
**United States Bankruptcy Judge**

PRC, LLC ("Debtor") and Bank of America, N.A. ("BOFA") have filed cross-motions for summary judgment in this adversary proceeding in these confirmed chapter 11 cases. These jointly-administered chapter 11 cases were commenced by Debtor and its affiliates—Panther/DCP Intermediate Holdings, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC[1]—on January 23, 2008 ("Petition Date"). On June 20, 2008, the Court confirmed Debtor's chapter 11 Plan.

The summary judgment motions raise the issue whether BOFA's $2,488,218.33 claim arising out of a hedge agreement was correctly classified by the Debtor as an unsecured Class 6 Claim, or whether, instead, it should be classified as a Class 4 First Lien Claim, as BOFA contends. Class 6 claims are likely to recover 67–73%, while Class 4 claims are likely to recover only 4–8%, reducing BOFA's recovery by as much as $1.6 million.

For the reasons explained below, the Court concludes that BOFA's claim was properly classified as a Class 4 Claim. As there are no material disputed issues of fact, PRC's motion for summary judgment is granted and BOFA's cross-motion for summary judgment is denied.

---

[1]    For purposes of the summary judgment motion, differences between Debtor and its affiliates are not material. Accordingly, the term "Debtor" will be used to refer to Debtor or any of its affiliates.

## BACKGROUND

<u>Transactional Background</u>

The following material facts are undisputed.[2]  On November 29, 2006, PRC, as

borrower, and other parties as guarantors, entered into a series of agreements with lender

parties, and with Royal Bank of Scotland PLC ("RBS") as Administrative Agent and

Collateral Agent and RBS Securities Corporation ("RBSS") as Sole Lead Arranger and

Sole Book Running Manager.  (Joint Statement ¶ 3).  Debtor and its guarantors entered

into an Amended and Restated First Lien Credit and Guaranty Agreement ("First Lien

Credit Agreement"), which was amended and restated on December 20, 2006, with RBS,

RBSS and lender parties ("First Lien Lenders").  (*Id*.).  Pursuant to the First Lien Credit

Agreement, the First Lien Lenders agreed to extend a revolving credit facility and term

loan to Debtor.  On December 27, 2006, pursuant to an Assignment and Assumption

Agreement between RBS and BOFA, BOFA became a lender under the Credit

Agreement.  (*Id.*).

On November 29, 2006, the same date that the First Lien Credit Agreement was

executed, Debtor, guarantors of Debtor, and RBS entered into a First Lien Security

Agreement ("Security Agreement").  (*Id.*, ¶ 5).  Pursuant to the Agreement, Debtor

granted a lien on and a security interest in substantially all of its assets to RBS in RBS's

capacity as Collateral Agent.  RBS perfected the lien and security interest by timely filing

a UCC Financing Statement.  The Security Agreement defines the term "Secured Parties"

as follows:

---

[2]        Unless otherwise noted, all undisputed material facts are taken from Debtor and BOFA's Joint
Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1 In Support of Cross
Motions for Summary Judgment ("Joint Statement") (Case No. 08-01395, Dkt. No. 10).

> collectively, the Administrative Agent, the Collateral
> Agent, each other Agent, the Lenders and each party to the
> Hedge Agreement if at the date of entering into such Hedge
> Agreement such person was a Lender or an Affiliate of a
> Lender and such person executes and delivers to the
> Administrative Agent a letter agreement . . . pursuant to
> which such person (i) appoints the Collateral Agent as its
> agent under the applicable Loan Documents and (ii) agrees
> to be bound by the provisions of <u>Section 9.03</u>, <u>10.02</u>, and
> <u>10.14</u> of the First Lien Credit Agreement.

Prior to the Petition Date, BOFA did not execute and deliver such a letter agreement

("Collateral Agent Appointment Letter") to RBS.  (*Id.*, ¶ 6).

Sections 9.03, 10.02, and 10.14 of the Credit Agreement accord certain

protections to RBS and Debtor.  Section 9.03, entitled "Exculpatory Provisions," limits

the scope of RBS's agency to the express provisions of the First Lien Credit Agreement

and protects RBS from liability for actions taken in connection with the Credit

Agreement.  Section 10.02, entitled "Expenses; Indemnity; Damage Waiver," requires

Debtor to indemnify RBS and "each Lender" from "all losses, claims, damages, liabilities

and related expenses" arising from actions taken in connection with Credit Agreement.

Section 10.02 also reflects a broad waiver of consequential damages, providing that "[t]o

the fullest extent permitted by applicable law, the parties hereto shall not assert, and

hereby waive, any claim on any theory of liability, for special, indirect, or consequential

or punitive damages (as opposed to direct or actual damages) arising out of, or in

connection with, or as a result of" the Credit Agreement and related documents.  This

expansive waiver also protects Debtor, as a party to the Credit Agreement.  Section

10.14, entitled "Governing Law; Jurisdiction; Etc.," provides that New York law will

govern the parties' rights and obligations under the Credit Agreement.

On the same date, November 29, 2006, Debtor and RBS, in its capacity as Administrative Agent and Collateral Agent, entered into an Intercreditor Agreement ("Intercreditor Agreement").  (*Id*., ¶ 7).  The Intercreditor Agreement recognized that Debtor and its guarantors had entered into a Second Lien Credit and Guaranty Agreement ("Second Lien Credit Agreement"), also dated November 29, 2006, with lender parties ("Second Lien Lenders") and RBS.  (Intercreditor Agreement, Joint Statement Exh. 7, Recitals).   The purpose of the Agreement was to ensure that First Lien Claims have priority over claims by Second Lien Lenders ("Second Lien Claims").  (Id.).

On January 30–31, 2007, Debtor and BOFA entered into the International Swap and Derivatives Association Master Agreement ("Hedge Agreement"), a Schedule to the Hedge Agreement, and a confirmation.  (Joint Statement ¶ 3).  Pursuant to the Agreement, Debtor agreed to borrow cash flow from a floating rate of interest on a notional amount, in exchange for providing cash flow from a fixed rate.  (Hedge Agreement, Joint Statement Exh. 5).

Procedural Background

On March 8, 2008, Debtor filed its redacted Schedules, listing BOFA as a holder of an unsecured, nonpriority claim based upon the Hedge Agreement in an unknown and unliquidated amount.  (Joint Statement ¶ 8; Case No. 08-10239, Dkt. No. 218).

On April 29, 2008, BOFA filed a proof of claim in the amount of $2,488,218.33 plus post-petition interest and reasonable out-of-pocket expenses, including legal fees.  (Joint Statement ¶ 9).  The basis of the claim was termination of the Hedge Agreement.  BOFA maintains that the Debtor's bankruptcy constitutes an "Event of Default" pursuant

to the Hedge Agreement, entitling BOFA to early termination and net closeout amounts due to BOFA.  (Proof of Claim, Joint Statement Exh. 8, §§ 6(a), 5(a)(vii), 6(e)(i)).

On May 12, 2008, Debtor filed its Disclosure Statement and Joint Plan of Reorganization Under Chapter 11 ("Plan").  (Joint Statement ¶ 2; Case No. 08-10239, Dkt. Nos. 403, 404).  The Plan classifies the claims of First Lien Lenders arising under the Credit Agreement as Class 4 Allowed Prepetition First Lien Claims.[3]  Each holder of a Class 4 Claim receives its *pro rata* share of the aggregate amount of $119,350,000— approximately 67–73% of their claims.  (Disclosure Statement at 37; Answer and Response to the Complaint Filed by Bank of America, N.A. ("Answer"), at 7, n. 6).  The Plan classifies unsecured nonpriority claims as Class 6 Claims.  Each holder of a Class 6 Claim receives its *pro rata* share of the aggregate amount of $1,350,000—approximately 4–8% of their claims.

On June 11, 2008, BOFA filed an objection to confirmation, arguing that Debtor improperly failed to classify its claim under the Hedge Agreement ("Hedge Claim") as a Class 4 Claim.  (Case No. 08-10239, Dkt. No. 475).  BOFA maintains that its recovery under the Plan on its $2,488,218.33 claim could be reduced by as much as $1.6 million if it were classified as a Class 6 Claim instead of a Class 4 Claim.  (Answer at 7 n. 6).[4]

On June 20, 2008, this Court entered an Order confirming Debtor's Plan ("Confirmation Order").  (Joint Statement ¶ 2; Case No. 08-10239, Dkt. No. 512).  According to the Confirmation Order, if the Court determines that BOFA's claim under the Hedge Agreement has "the same priority" as an Allowed Prepetition First Lien Claim,

---

[3]    By definition, the group of Class 4 Claims only includes First Lien Claims.  Accordingly, this Decision uses the terms "Class 4 Claims" and "First Lien Claims" interchangeably.

[4]    To illustrate, the difference between a total recovery of 8 percent (approximately $199,507) and 73 percent (approximately $1,833,816) on BOFA's $2,488,218 claim amounts to $1,634,759.

then the BOFA claim would be treated for all purposes as a Class 4 Claim,

notwithstanding any contrary provisions in the Plan, Plan Supplement, or exhibits.

(Confirmation Order ¶ 57, Case No. 08-10239, Dkt. No. 512).

On August 27, 2008, Debtor commenced an adversary proceeding and Objection

to the Claim filed by BOFA. (*PRC, LLC v. Bank of America, N.A.*, Adv. Pro. No. 08-

01395, Dkt. No. 1).[5]  The Complaint and Objection argue that the Hedge Claim is not a

secured claim due to BOFA's failure to execute and deliver the Collateral Agent

Appointment Letter.  PRC also asserts that BOFA, as the holder of an unsecured claim, is

not entitled to post-petition interest and reasonable out-of-pocket expenses, including

legal fees.  On September 14, 2008, BOFA filed its Answer and Response to the

Complaint ("Answer").  (Dkt. No. 3).  BOFA maintains that it holds a secured claim that

is entitled to treatment as a First Lien Claim.

On October 6, 2008, Debtor and BOFA filed cross-motions for summary

judgment.  ("Debtor S.J. Motion" and "BOFA S.J. Motion," Dkt. Nos. 8, 11,

respectively).  The parties move pursuant to FED. R. CIV. P. 56, made applicable to this

adversary proceeding by FED. R. BANKR. P. 7056.  The parties have complied with

S.D.N.Y. BANKR. LOCAL R. 7056-1 governing summary judgment motions by filing a

supporting Joint Statement.  (Dkt. No.10).  On October 20, 2008, BOFA filed a

Declaration and Memorandum of Law in Opposition to Debtor's Motion for Summary

Judgment ("BOFA Opposition").  (Dkt. Nos. 14, 15).  On the same date, Debtor replied

with a Response to BOFA's Motion for Summary Judgment ("Debtor Response").  (Dkt.

No. 16).  On November 3, BOFA and Debtor filed their second response papers ("BOFA

Second Reply," Dkt. No. 17, and "Debtor Second Reply," Dkt. No. 18, respectively).

---

[5]        Unless otherwise noted, further docket citations refer to the Adversary Proceeding.

## DISCUSSION

### A.  Standard for Summary Judgment

Rule 7056 of the Federal Rules of Bankruptcy Procedure adopts Rule 56 of the

Federal Rules of Civil Procedure, which provides that a party is entitled to summary

judgment if the record demonstrates that "there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.

In other words, summary judgment may be granted only if there exists no genuine issue

of material fact that would permit a reasonable jury to find for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material if it "might

affect the outcome of the suit under governing law." *Id.* at 248.

On a motion for summary judgment, the moving party has the burden of

demonstrating the absence of any genuine issue of material fact, and all inferences to be

drawn from the underlying facts must be viewed in the light most favorable to the party

opposing the motion.  *Anderson*, 477 U.S. at 249; *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 157 (1970); *U.S. v. Certain Funds on Deposit in Scudder Tax Free Inv. Account No.*

*2505103*, 998 F.2d 129, 131 (2d Cir. 1993).  Once the moving party has made an initial

showing that there is no evidence to support the nonmoving party's case, the party

opposing the motion must come forward with competent summary judgment evidence of

the existence of a genuine issue of fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).

When cross-motions for summary judgment are made, as in this case, courts use

the same standard governing individual motions for summary judgment.  *In re Sterling*

*Optical Corp.*, 371 B.R. 680, 684 (Bankr. S.D.N.Y. 2007); *In re Worldcom, Inc.*, 361

B.R. 675, 681 (Bankr. S.D.N.Y. 2007) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).  In other words, each motion must be considered independently of the other and the court must consider the facts in the light most favorable to the non-moving party for each.  *Sterling Optical Corp.*, 371 B.R. at 684.  In such a situation, the court is not required to grant judgment as a matter of law for one side or the other.  *Id.*

**B.  Governing Authority**

    1.  <u>A Secured Claim Has Higher Priority than an Unsecured Claim</u>

Section 506(a) of the Bankruptcy Code provides that "an allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ."  11 U.S.C. § 506(a).  A claim is a secured claim to the extent that the claimant holds a lien on a debtor's property, which in turn depends on whether the debtor has granted the claimant a security interest.  *In re Richardson*, 307 B.R. 485, 488 (Bankr. D. Md. 2004).

Under the priority scheme of the Bankruptcy Code, a secured claim is entitled to higher priority in the repayment process than an unsecured claim.  *See In re Darnell*, 834 F.2d 1263, 1265 (6th Cir. 1987) (holding generally that a perfected lien must be satisfied out of the assets it encumbers before any proceeds of the assets are available to unsecured claimants).  A secured claim does not fall within the Bankruptcy Code's priority scheme; instead, such claim has a superior stake in repayment from encumbered property relative to an unsecured claim to such property.  *See* 4 COLLIER ON BANKRUPTCY 507.02[4][a]

(indicating that the rights of holders of secured claims are not affected by the rights to

priority under Section 507); 3 NORTON BANKR. L. P. 3d § 9 (2008).

> 2. <u>Principles of Contract Law Interpretation</u>

State law, not the Bankruptcy Code, controls whether a security interest has been

granted. In this case, New York law governs the Credit Agreement and Security

Agreement. (Credit Agreement § 10.14(a), Security Agreement § 11.7, Joint Statement

Exhs. 3 and 6, respectively). Accordingly, the Court must apply New York contract

interpretation principles to determine whether BOFA's Hedge Claim is a secured claim.

In New York, the general rule is that written contracts executed simultaneously,

by the same parties, and for the same purpose must be read together. *See Liberty USA

Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F. Supp.2d 421, 425–27 (S.D.N.Y. 2005)

(holding that Promissory Note and Asset Purchase Agreement be "construed as one

contract" because Note was incorporated in Agreement, was executed on the same date,

by the same parties, for the same purpose). *See also* 22 N.Y. JUR. 2d, Contracts § 255

("In the absence of anything to indicate the contrary intention, instruments executed at

the same time, by the same parties, for the same purpose, and in the course of the same

transaction will be read and interpreted together, it being said that they are, in the eye of

the law, one instrument."). This rule extends to writings that form part of a single

transaction, even if executed on different dates and between different parties. *See

Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 262–65 (2d Cir. 1965) (construing

together a transactionally-related release agreement and assignment agreement, signed on

different dates and by different parties). This rule is not limited to circumstances in

which one set of documents is executed for the sole purpose of making payments under

another document, such as notes and credit agreements respectively. *See id.* (construing together release agreement and assignment agreement).

In New York, a court must give effect to the unambiguous language of a contract. *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992); *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006). If unambiguous language is present, a court may not look further than the four corners of a contract. *See W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990); *Nicholas Laboratories, Ltd. v. Almay, Inc.*, 900 F.2d 19, 21 (2d Cir. 1990); N.Y. JUR. 2d Contracts § 210. In other words, if a contractual term has a clear meaning, a court may not refer to extrinsic documents to determine the parties' intentions concerning that term. This general principle extends to the interpretation of security agreements. *See In re Gordon Car and Truck Rental, Inc.,* 75 B.R. 466, 472 (Bankr. N.D.N.Y. 1987) ( "[T]he language of security agreements is to be interpreted as written.")

Contractual language is unambiguous if the language has a definite and precise meaning and no reasonable person could disagree on this meaning. *White v. Continental Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (citing *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). To determine whether a contract provision is ambiguous, courts may review related agreements entered contemporaneously. *See In re Northwest Airlines Corp.*, 393 B.R. 337, 345 (Bankr. S.D.N.Y. 2008).

3. Exercise of Equitable Powers

The Second Circuit has remarked that bankruptcy courts should apply equitable principles to avoid substantial forfeiture caused by technical breach. *See In re Ames Dept. Stores, Inc.*, 288 B.R. 339 (Bankr. S.D.N.Y. 2003) (citing *In re Lavigne*, 114 F.3d

379, 387 (2d Cir. 1997)); *In re C.A.F. Bindery, Inc.*, 199 B.R. 828 (Bankr. S.D.N.Y.

1996). In *Ames*, Judge Gerber permitted a tenant to exercise an option contract to extend

the term of a lease in a manner that landlord had previously accepted without objection,

which did not comply with the technical requirements for extension. In *C.A.F. Bindery*,

Judge Bernstein recognized that "equity abhors forfeitures, and will intervene to prevent

(1) a substantial forfeiture caused by a trivial or technical breach . . . ," 199 B.R. at 834,

but a tenant's failure to pay rent was not merely a technical breach, and did not warrant

the use of equitable powers. *Ames* and *Bindery* concerned forfeiture of rights held by the

debtor, rather than any attempt to create rights that did not already exist.

     In bankruptcy cases, the exercise of equitable principles is governed by

Bankruptcy Code § 105(a). Section 105(a) provides that a bankruptcy court "may issue

any order, process or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a). Pursuant to § 105, a court may only exercise equitable

powers within the limits of the Code provisions. Section 105 is not a "roving

commission" for courts to do justice. *In re World Smart Technologies, LLC*, 423 F.3d

166, 183–85 (2nd Cir. 2005); *In re Go West Entertainment, Inc.,* 387 B.R. 435 (Bankr.

S.D.N.Y. 2008). Section 105 does not create substantive rights. Rather, it enables courts

to vindicate substantive rights created by independent Code provisions or state law. *See*

*World Smart Technologies*, 423 F.3d at 183–85 (holding that § 105(a) did not create an

independent basis to grant creditors standing to administer debtor's claims). In other

words, the exercise of equitable powers generally must be tied to a specific Code

provision.

**C.  BOFA's Claim Is An Unsecured Claim**

       1.  <u>The Express Language of the Security Agreement Controls</u>

Having examined contract interpretation principles under New York law, the

Court will now apply them to the present case.  In this case, the language of the Security

Agreement is clear and unambiguous.  By definition of "Secured Parties," the Agreement

granted a security interest to RBS for the benefit of certain parties.  Beneficial treatment

extended to a party to a hedge agreement only "if at the date of entering into such Hedge

Agreement such person was a Lender . . . and such person executes and delivers [the

Collateral Agent Appointment Letter] and agrees to be bound by Sections 9.03, 10.02 and

10.14 of the First Lien Credit Agreement."  BOFA, a party to a hedge agreement, was

required to take a further affirmative step—to execute and deliver the Collateral Agent

Appointment Letter—to qualify as a "secured party" with respect to claims arising from

the Hedge Agreement.

BOFA does not dispute the presence of unambiguous language in the Security

Agreement granting RBS a security interest for the benefit of secured parties.  Rather,

BOFA argues that it was a secured party respecting its Hedge Claim.  BOFA urges that

provisions of the relevant agreements reflect the parties' intentions that BOFA's Hedge

Claim should receive secured status.

BOFA first presents three provisions in the Intercreditor Agreement that allegedly

support its position.  In its Recitals, the Intercreditor Agreement provides:

> WHEREAS, the obligations of Borrower . . . under . . .
> Hedge Agreements will be secured on a first priority basis
> by liens on substantially all assets of Borrower . . . pursuant
> to the terms of the First Lien Collateral Documents.

Intercreditor Agreement at 1 (J.S. Exh. 7).   BOFA asserts that this recital reflects the

parties' intent that claims arising from hedge agreements are entitled to First Lien Claim

status.   (BOFA S.J. Motion at 16).   BOFA next presents Section 2.1 of the Agreement,

which provides:

> Notwithstanding the date, time, method or manner or order
> of grant, attachment or perfection of . . . any Liens securing
> the First Lien Obligations granted on the Collateral and
> notwithstanding . . . any defect or deficiencies in, or failure
> to perfect, the Liens securing the First Lien Obligations or
> any circumstance whatsoever . . .
>
> (a) any Lien on the Collateral securing any First Lien
> Obligations . . . shall be senior in all respects and prior to
> any Lien on the Collateral securing any Second Lien
> Obligations.

*See* Intercreditor Agreement, § 2.1.   BOFA urges that Section 2.1 reveals the parties'

intentions that the Hedge Claim receive First Lien Claim status despite BOFA's failure

formally to appoint RBS as collateral agent.   (See Credit Agreement; BOFA Opposition

at 4).   Finally, BOFA highlights Section 2.2 of the Intercreditor Agreement, which

provides:

> all Liens on the Collateral securing any First Lien
> Obligations shall be and remain senior in all respects and
> prior to all Liens on the Collateral securing any Second
> Lien Obligations . . . notwithstanding any failure . . . of the
> First Lien Claimholders to adequately perfect their security
> interests in the Collateral . . . or the avoidance, invalidation
> or lapse of any Lien on the Collateral securing First Lien
> Obligations.

Intercreditor Agreement § 2.2.   Section 2.2 provides that First Lien Claims are prior to

Second Lien Claims despite any "avoidance, invalidation, or lapse of the Lien on the

Collateral."   BOFA argues that Section 2.2 illustrates the parties' intent to treat the Hedge

Claim as a First Lien Claim despite BOFA's failure to execute and deliver the Collateral

Agent Appointment Letter.  (*Id.*).

BOFA next turns to the Credit Agreement.  Even if BOFA does not qualify as a

"Secured Party" within the meaning of the Security Agreement, BOFA urges, BOFA's

Hedge Claim is entitled to First Lien Claim treatment under Section 8.02 of Credit

Agreement, relating to distribution of collateral proceeds.  (BOFA S.J. Motion at 16–17).

Section 8.02, the "waterfall" provision, provides:

> Subject to the terms of the Intercreditor Agreement, the
> proceeds received by the Collateral Agent in respect of any
> sale of, collection from or other realization upon all or any
> part of the Collateral pursuant to the exercise by the
> Collateral Agent of its remedies shall be applied . . . as
> follows: . . . (d) *Fourth*, to the indefeasible payment in full
> in cash, pro rata, of principal amount of the Obligations and
> any premium thereon . . . and any breakage, termination or
> other payments under Hedge Agreements constituting
> Obligations and any interest accrued thereon . . . .

Credit Agreement § 8.02 (J.S. Exh. 3).   Section 8.02 registers the parties' intent that

Hedge Claims be satisfied out of proceeds received from disposition of the collateral, *pro

rata* with First Lien Claims.  (BOFA S.J. Motion at 16–17).

BOFA is correct that the relevant agreements should be interpreted together.  The

Credit Agreement, Intercreditor Agreement, and Security Agreement were executed by

the same parties, on the same date, November 29, 2006, and for the single purpose of

facilitating credit extensions to Debtor.  The Hedge Agreement was entered subsequently,

on January 30–31, 2007, but as part of the same transaction.  The Intercreditor

Agreement and Security Agreement expressly refer to the Credit Agreement.  (*See*

Intercreditor Agreement at 1, Security Agreement at 1.1(a) (Joint Statement Exhs. 7, 6,

respectively)).  Likewise, Debtor would have been in default under the Credit Agreement

if it had not executed the Hedge Agreement.  (Credit Agreement §§ 5.13, 8.01(e)).

Finally, by definition of "Secured Parties," the Security Agreement contemplates that

parties will enter into hedge agreements.  Accordingly, the Court must examine these

agreements collectively to determine whether the Hedge Claim benefitted from the

security interest grant to RBS.

Reading these agreements together does not create any ambiguity.  The Security

Agreement is the only document that actually grants a security interest in collateral.  The

other documents govern how secured collateral shall be dealt with but they do not grant

security interests.  The other documents do not create any ambiguity in how a security

interest in collateral is created.  Accordingly, the Court may not look beyond the clear

granting language in the Security Agreement to determine the parties' intentions.  *See*

*Giancontieri*, 77 N.Y.2d at 162; *Almay, Inc.*, 900 F.2d at 21.

The provisions in the other agreements upon which BOFA relies confirm that the

other documents do not confer an independent security interest.  Section 8.02 of the

Credit Agreement governs the distribution of proceeds of "Collateral."  The Credit

Agreement defines the terms "Collateral" and "Collateral Documents" as follows:

> "Collateral" means, collectively, all of the real, personal
> and mixed property . . . in which Liens are purported to be
> granted pursuant to the Collateral Documents as security
> for the Obligations.
>
> "Collateral Documents" means the Intercreditor
> Agreement, the Security Agreement . . . and all other
> instruments, documents, and agreements delivered by any
> Loan Party pursuant to this Agreement or any of the other
> Loan Documents in order to grant to the Collateral Agent,
> for the benefit of the Secured Parties, a Lien on any real,
> personal or mixed property of that Loan Party as security
> for the Obligations.

Credit Agreement § 1.01.  Accordingly, the "waterfall" provision of the Credit

Agreement entitles parties to distribution only from "Collateral"—property on which

such parties hold a pre-existing, independent security interest.  Thus, BOFA cannot

bootstrap an otherwise unsecured claim into a secured claim merely on the basis of

Section 8.02.

Likewise, other provisions of the Intercreditor Agreement—the Recitals, Section

2.1, and Section 2.2—all apply by their terms only to holders of "Collateral."  The

Intercreditor Agreement defines "Collateral" and "First Lien Collateral" as follows:

> "<u>Collateral</u>" means all of the assets and property of any
> Grantor . . . constituting both First Lien Collateral and
> Second Lien Collateral.

> "<u>First Lien Collateral</u>" means all of the assets and property
> of any Grantor . . . with respect to which a Lien is granted
> as security for any First Lien Obligations.

Intercreditor Agreement § 1.1.  As with the Credit Agreement, the Intercreditor

Agreement standing alone does not create a security interest; it only governs the

treatment of collateral upon which a security interest has already been granted.

Likewise, BOFA argues that Section 2.2 of the Intercreditor Agreement vaults its

Hedge Claim into a First Lien Claim.  As explained above, Section 2.2 provides that First

Lien Claims are prior to Second Lien Claims despite "avoidance, invalidation, or lapse of

any Lien on the Collateral."  BOFA's argument is not persuasive because BOFA's failure

to execute and deliver the Collateral Agent Appointment Letter was not a failure to

perfect a pre-existing security interest.   Rather, such failure meant that no security

interest was ever granted.

BOFA also argues that, in the event that terms of the Security Agreement and Intercreditor Agreement conflict, the Intercreditor Agreement controls. (BOFA's Second Reply, at 12). Section 11.1(e) of the Security Agreement provides: "[i]n the event of any conflict between the terms of this Agreement and the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern." However, for reasons explained above, there is no conflict between the Security Agreement and Intercreditor Agreement.

BOFA next cites *RJE Corp. v. Northville Industries Corp.*, 198 F. Supp.2d 249 (E.D.N.Y. 2002), for the proposition that courts may refer to the terms and purpose of concurrently-executed contracts, even in the face of clear, unambiguous language. (*See* Debtor's Second Reply at 6–7). *RJE* is distinguishable because in that case interpreting a term according to its plain meaning would render another provision "illusory." In this case, other agreements would not be rendered "illusory" if the Court finds that the Hedge Claim is unsecured. Provisions cited by BOFA relating to Debtor's obligations and the distribution of collateral respecting hedge claims presuppose that such claims are secured. Such provisions would not be rendered meaningless if this were not the case.

2.  RBS Did Not Become BOFA's Agent Because BOFA Failed to Execute and Deliver the Collateral Agent Appointment Letter

As explained above, BOFA's failure to execute and deliver the Collateral Agent Appointment Letter precluded secured claim status for BOFA's Hedge Claim. However, BOFA argues that the letter submission requirement was a "mere formality" because RBS was BOFA's *de facto* agent. Because RBS was BOFA's *de facto* agent, BOFA argues, the Hedge Claim is entitled to secured claim treatment despite failure to comply with the formal letter submission requirement. (BOFA S.J. Motion, at 17–18; BOFA Opposition, at 6–8). This argument is not persuasive for several reasons.

First, BOFA argues that the letter requirement had two substantive purposes—to appoint RBS as its Collateral Agent under the applicable documents and to bind BOFA to certain provisions of the Credit Agreement benefiting RBS.  BOFA maintains that these objectives had already been achieved because BOFA appointed RBS its Collateral Agent in Section 9.01 of the Credit Agreement.  Section 9.01, in relevant part, reads:

> RBS plc is hereby appointed Administrative Agent and Collateral Agent hereunder, and each Lender hereby authorizes Administrative Agent and Collateral Agent to act as its agent in accordance with terms hereof and the other Loan Documents.  Each of the Lenders . . . hereby irrevocably appoints RBS plc as its agent hereunder and under the other Loan Documents and authorizes Administrative Agent and Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to [them] by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.

Credit Agreement § 9.01.  Accordingly, BOFA argues, BOFA via the Assignment Agreement had already appointed RBS as its Collateral Agent under the Credit Agreement.  (BOFA S.J. Motion at 17–18).

Second, the argument goes, even if BOFA did not appoint RBS as its Collateral Agent under the Credit Agreement, there was an implied agency relationship between BOFA and RBS.  (BOFA Opposition at 7).  All parties, including RBS, were aware of the existence of the Hedge Agreement.  (*Id.*).  Accordingly, BOFA argues, RBS impliedly consented to act as agent under the Hedge Agreement.  *Id.* (citing *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F. Supp.2d 357, 373 (W.D.N.Y. 2003); RESTATEMENT (THIRD) OF AGENCY § 2.02 cmt. d (2006)).  BOFA concludes that an agency relationship existed between RBS and Debtor and the letter requirement was a "mere formality."  (Answer, at 15, n. 10).

BOFA's arguments are not persuasive.  Pursuant to Section 9.01 of the Credit Agreement, RBS would act as agent for "Lenders."  However, Section 9.01 does not extend to a party who is a "Lender Counterparty" within the meaning of the Credit Agreement.  After defining "Lender," the Credit Agreement defines "Lender Counterparty" as follows:  "each Lender . . . counterparty to a Hedge Agreement." (Credit Agreement § 1.01).  Moreover, the Security Agreement requires that "each party to a Hedge Agreement" take additional affirmative steps—namely, execute and deliver the Collateral Agent Appointment Letter—to appoint RBS as its collateral agent for hedge agreements.  Reading these provisions together, Section 9.01 clearly does not extend to a party, like BOFA, seeking to appoint RBS as its agent to administer its hedge agreements.

Likewise, the Hedge Agreement is not a "Loan Document" within the meaning of Section 9.01. The Credit Agreement defines "Loan Documents" as any instrument executed "for the benefit of any Agent, Issuing Bank or Lender . . . ."  (Credit Agreement § 1.01).  The Hedge Agreement was executed for the benefit of BOFA as a "Lender Counterparty"—a term that the Credit Agreement clearly distinguishes from "Lender." Accordingly, Section 9.01 does not apply to appoint RBS as Collateral Agent concerning the Hedge Agreement.

Furthermore, the Court is not persuaded that an implied agency relationship existed. The Security Agreement required that BOFA take specific steps to appoint RBS as its agent under the Hedge Agreement.  In *Paul T. Freund Corp.*, 288 F. Supp.2d at 373, no agreement requiring specific steps to create an agency relationship was present.

20

Accordingly, the cases BOFA cites do not support finding an implied agency relationship in this situation.

**D.  Equity Does Not Demand a Different Result**

BOFA next argues that, even if BOFA does not hold a security interest, the Court should apply equitable principles to create a security interest in favor of BOFA.  (BOFA S.J. Motion Memorandum at 18–21).  The Court does not have the power to rewrite the parties' contracts which unambiguously required BOFA to execute and deliver the Collateral Agent Appointment Letter to obtain a first priority security interest for the Hedge Agreement.  Equitable power may, in appropriate circumstances, be used to prevent forfeiture of substantial rights already held by a party.  This case does not present such circumstances as BOFA never obtained a security interest to forfeit.

BOFA argues that its failure to execute and deliver the Collateral Agent Appointment Letter was a technical omission that did not prejudice any party.  (BOFA S.J. Motion at 18).  BOFA claims that it will suffer a substantial forfeiture because unsecured treatment may reduce its recovery under the Hedge Claim by as much as $1.6 million.

The execution and delivery of the Collateral Agent Appointment Letter was not merely a ministerial act.  The letter bound RBS and BOFA to comply with Section 10.02 of the Credit Agreement with respect to hedge agreements.  As explained above, Section 10.02 provides a broad waiver of consequential damages and governs Debtors' responsibility to indemnify RBS.  In the absence of such a letter executed by a party to a hedge agreement, Debtor would not hold rights and obligations to indemnification and waiver of consequential damages arising from such agreements.  The waiver of BOFA's

21

possible claim for consequential damages arising from Debtor's breach of the Hedge

Agreement was a material benefit for the Debtor that would only arise from BOFA's

execution and delivery of the Collateral Agent Appointment Letter.

Moreover, BOFA does not cite any particular Bankruptcy Code provision

supporting exercise of equitable powers. BOFA does not argue that rights already

conferred by a specific provision would be furthered. Instead, BOFA argues that a

specific reference to a Code provision is not required. (BOFA's Second Reply at 15,

n.14). BOFA cites *Matter of Federated Dep't Stores, Inc.*, 133 B.R. 886, 890–92 (S.D.

Ohio 1991). In *Federated Dep't Stores*, the district court upheld a bankruptcy court's

exercise of equitable powers despite that court's failure to rely upon a specific provision.

However, the court further remarked that any exercise of equitable authority must not

"fly in the face of unambiguous language of the applicable statutes." *See id.* at 890. In

this case, § 506 requires that a secured claimant hold a lien on property. If the court were

to create a security interest in favor of BOFA, such exercise would "fly in the face" of §

506.

Alternatively, BOFA argues that Bankruptcy Code § 1122 justifies use of

equitable authority. Section 1122 provides that "a plan may place a claim or interest in a

particular class only if such claim or interest is substantially similar to the other claims or

interests of such class." BOFA argues that the First Lien Claims and the Hedge Claim

are "substantially similar" because the parties intended that BOFA hold a secured claim.

Therefore, BOFA concludes, § 1122 provides a hook for the exercise of equitable power.

BOFA's argument begs the ultimate issue—whether the Hedge Claim is entitled to

secured claim status.  Accordingly, the current circumstances do not justify exercise of equitable powers.

### E.  Debtor Has Standing and No Material Issues of Fact Exist

BOFA argues that Debtor lacks standing to seek summary judgment because Debtor is not a real party in interest to the adversary proceeding.  (BOFA S.J. Motion at 21).  However, as a condition to confirmation, Debtor and BOFA specifically agreed to reserve the issue of the Hedge Claim's status for subsequent argument.  (Confirmation Order 57, Case No. 08-10239, Dkt. No. 512).  BOFA may not now claim that Debtor lacks standing to commence the adversary proceeding and bring this summary judgment motion.

Next, BOFA argues that there is a material issue of fact precluding summary judgment.  (BOFA Opposition at 9).  BOFA makes this argument despite having filed with Debtor a Joint Statement of Undisputed Material Facts.  BOFA alleges that the other First Lien Lenders are really the parties contesting BOFA's purported lien through Debtor, although the First Lien Lenders are contractually barred from doing so by the Intercreditor Agreement.  (BOFA S.J. Motion at 12; Intercreditor Agreement, § 2.4).  BOFA argues that time entries from James Grogan ("Grogan"), an attorney at Weil Gotshal representing Debtor, indicate eight communications between Grogan and the First Lien Lenders regarding the BOFA Claim.  (Declaration of Howard B. Levi in Opposition to Plaintiff's Motion for Summary Judgment ("Levi Declaration,") Dkt. 14, para. 3).  BOFA argues that these communications demonstrate that the First Lien Lenders made a "back-door" attempt to circumvent Section 2.4 of the Intercreditor Agreement, raising a material issue of fact.  (BOFA Opposition at 9).

The fact that the First Lien Lenders benefit by a determination that BOFA's Hedge Claim is unsecured is obvious. That representatives of the First Lien Lenders may have spoken with Debtor's counsel about their arguments regarding BOFA's claim does not create a material issue of disputed fact. Pursuant to the Plan, the Debtor retained the right to challenge BOFA's alleged secured claim, first asserted as an objection to confirmation but then reserved in the confirmation order for later resolution. Accordingly, there is no material issue of fact preventing the Court from granting summary judgment in favor of Debtor.

## G.  BOFA May Not Collect Post-Petition Interest and Attorneys' Fees on Its Unsecured Claim

Finally, BOFA requests post-petition interest and attorneys' fees respecting its Hedge Claim. (BOFA S.J. Motion Memorandum at 22; BOFA Opposition Motion at 9–10). Section 506(a) only permits oversecured holders of secured claims to receive post-petition interest and attorneys' fees. As explained, BOFA's Hedge Claim is not entitled to secured claim status.

Debtor also argues that if BOFA recovers post-petition interest and attorneys' fees, it will recover an amount greater than permitted by the Confirmed Plan. In fact, the confirmed Plan provides that the claims of First Lien Lenders are only allowed in the principal amount of $119,350,000.00. (*See* Plan, § 4.4(b), Case No. 08-10239 Dkt. No. 404). Thus, even the holders of allowed First Lien Claims will not recover interest and attorneys' fees. Therefore, whether or not BOFA holds a secured or unsecured claim, it would not be entitled to recover interest and attorneys' fees. Of course, the Court has determined that BOFA's claim was properly classified by the Debtor as an unsecured claim, precluding recovery of post-petition interest and attorneys' fees.

## CONCLUSION

For the foregoing reasons, PRC's motion for summary judgment is **GRANTED**.

Defendant's cross-motion for summary judgment is **DENIED**.  PRC's counsel shall settle

an Order consistent with this opinion.

DATED:  New York, New York
            December 24, 2008

                                                                    __/s/ Martin Glenn_____
                                                                    **THE HON. MARTIN GLENN**
                                                                    United States Bankruptcy Judge